IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d) | MAGISTRATE NO. **16.903M**<br><br>UNDER SEAL |

**APPLICATION OF THE UNITED STATES**
**FOR AN ORDER PURSUANT TO 18 U.S.C. § 2703(d)**

The United States of America, moving by and through its undersigned counsel, Conor Lamb, respectfully submits under seal this *ex parte* application for an Order pursuant to 18 U.S.C. § 2703(d). The proposed Order would require SPRINT, a cellular service provider, to disclose certain records and other information pertaining to cellular telephone number **(804) 721-5680** [herein after referred to as Target Telephone #1 (**TT#1**)] with service provided by SPRINT, as described in Part I of Attachment A to the proposed Order. The records and other information to be disclosed are described in Part II of Attachment A to the proposed Order. In support of this application, the United States asserts:

LEGAL BACKGROUND

1. SPRINT is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15), and/or a remote computing service, as defined in 18 U.S.C. § 2711(2). Accordingly, the United States may use a court order issued under § 2703(d) to require SPRINT to disclose the items

1

described in Part II of Attachment A. See 18 U.S.C. § 2703(c)(2) (Part II.A of Attachment A); 18 U.S.C. § 2703(c)(1) (Part II.B of Attachment A).

2. This Court has jurisdiction to issue the proposed Order because it is "a court of competent jurisdiction," as defined in 18 U.S.C. § 2711. See 18 U.S.C. § 2703(d). Specifically, a United States Magistrate Judge of the District Court in the Western District of Pennsylvania has jurisdiction over the offense being investigated. See 18 U.S.C. § 2711(3)(A)(i).

3. A court order under § 2703(d) "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). Accordingly, the next section of this application sets forth specific and articulable facts showing that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation.

## THE RELEVANT FACTS

4. The following information was provided to the undersigned applicant by ATF Senior Special Agent Maurice J. Ferentino. Agent Ferentino has been employed by the ATF since

2

1998. As a Senior Special Agent employed by the ATF, he is responsible for investigating violations of federal law, including 18 U.S.C. § 924(c) (Using and Carrying a Firearm During and in Relation to a Crime of Violence or Possessing a Firearm in Furtherance of a Crime of Violence).

5. Agent Ferentino is aware as a result of his training and experience that people now rely heavily in their day-to-day activities on their cellular telephones and related communications. These communications, in the form of telephone calls, voice messages, sms text messages, and other similar communications, cause their cellular telephones to emit and receive electronic signals to and from cellular telephone company cell towers. The cellular telephone company records of the interaction between these signals and the cell towers used to receive and send them can indicate the general geographic location of the individual using a particular cellular telephone at a particular moment in time.

6. On Friday, August 22, 2014 at approximately 3:21 pm, Pittsburgh Police responded to the Hill District neighborhood of Pittsburgh, specifically 931 Cherokee Street, to a report of two people shot. This was the address of Tina and Patsy Crawford, mother and daughter. The Crawfords were discovered lying inside the garage of the residence. Tina Crawford was pronounced dead by paramedics on the scene and Patsy Crawford was transported to

UPMC Presbyterian in serious but stable condition. Both victims suffered gunshot wounds, with 29 shots fired. Tina was shot 10 times, including 3 shots to the head.

7. Multiple witnesses reported observing two black males wearing dark hooded sweatshirts running away from the scene, entering a silver SUV, and fleeing the scene.

8. Special Agent Ferentino is aware that on April 4, 2016, Price W. Montgomery was indicted by a federal grand jury seated in the Western District of Pennsylvania. The grand jury charged Montgomery with violating federal narcotics and firearm statutes in addition to the killing of TINA CRAWFORD, in order to prevent her from communicating information to a law enforcement officer or judge of the United States and the shooting of PATSY CRAWFORD in violation of 18 USC Sections 1512(a)(1)(c) and 2. Ferentino is also aware that Tina Crawford was cooperating with the United States, specifically the DEA, in the federal investigation of Montgomery in the months prior to her murder.

9. On July 13, 2016, August 2, 2016 and September 16, 2016, Bobby Ricks was interviewed by SA Ferentino and other law enforcement officers involved in the Crawford homicide investigation. These interviews were pursuant to a federal proffer agreement.

10. Ricks advised he had specific knowledge of the Crawford homicide from conversations he had with Montgomery, his

4

cousin Glenn Thomas and others. Specifically, Ricks recalled a conversation he was party to in August 2014 wherein Montgomery, Thomas and possibly James Perrin, a known criminal associate of Montgomery, discussed their knowledge of "a girl's" cooperation with law enforcement and the damage her information could inflict on their drug trafficking organization.

11. A day or two following the Crawford homicide, Ricks was visited at his residence by Thomas. Ricks described Thomas as "amped up" which was markedly different than Thomas's usual reserved demeanor. Thomas advised Ricks the "girl" was scheduled to be "debriefed by the feds" and he and Montgomery went looking for her. Thomas told Ricks that "somebody" told them the girl was leaving her residence to be "debriefed" and almost immediately as they pulled up to her residence they observed her and her mother exiting through the residence's front door and walking toward their vehicle parked in the garage. Thomas advised he was driving the vehicle and, immediately upon observing the girl, jumped out and began shooting. Montgomery also began shooting as he exited the vehicle.

12. Ricks advised that Thomas and Montgomery utilized a small, silver, Jeep, SUV (possibly a Jeep, Liberty) to transport them to and from the Crawford shooting. Ricks believed this vehicle was registered to Thomas's sister "Angela" at the time of the killing. (PA DMV Records indicates that Angela M. Jones

had a 2004 silver, Jeep, Liberty, PA Registration: HZA-9447, VIN: 1J4GL58K54W105672 registered to her in August 2014).

13. Ricks went on to tell investigators that in the days following the Crawford homicide he was directed by Thomas to take the captioned Jeep Liberty out of state because Thomas was concerned about media reports that a silver SUV was a suspect vehicle involved in the Crawford homicide.

14. Ricks drove the Jeep Liberty to southern Virginia (VA) and provided it to his cousin Russell Hill along with its PA vehicle title (A review of PA registration/title documents for this vehicle indicated the vehicle was transferred to Russell Hill on August 27, 2014).

15. On September 7, 2016, Russell Hill was interviewed by SA's Ferentino, Jamie Ball and Timothy Nutter. Hill recalled meeting with Ricks, who drove from Pittsburgh, in late August 2014 and obtaining both the captioned Jeep Liberty and its Title from him.

16. Hill advised that approximately 5 to 6 months following the transfer of the Jeep Liberty into his name he was directed by Ricks to deliver the vehicle to Ricks's associates near Washington, DC. Ricks provided Hill a telephone number of the person who Hill was supposed to meet and Hill recalled exchanging telephone calls, using **TT#1**, with that person(s) who directed him to a store where Hill left the vehicle stripped of the license plate pursuant to RICKS's instructions. Hill never

6

personally met with the individual(s) who ultimately gained possession of the vehicle nor did he keep a record of the telephone number of the individual he exchanged telephone calls with utilizing **TT#1**.

17.  Predicated upon the above information, investigators believe HILL utilized **TT#1** to contact an associate of Glenn Thomas, at the direction of Ricks, to drop off the Jeep Liberty utilized in the killing of Tina Crawford. A review of all available records from **TT#1** may be able to assist investigators as to the location of where the Jeep Liberty was transferred from Hill along with the telephone numbers and identities of the person(s) who took possession of that vehicle from Hill.

REQUEST FOR ORDER

18.  The facts set forth in the previous section show that there are reasonable grounds to believe that the records and other information described in Part II of Attachment A are relevant and material to an ongoing criminal investigation. Specifically, these items will help the United States to identify and locate the individuals who are responsible for the events described above, and to determine the nature and scope of their activities. Accordingly, the United States requests that SPRINT be directed to produce all items described in Part II of Attachment A to the proposed Order.

19.  The United States further requests that the Order require SPRINT not to notify any person, including the

subscriber or customer of the account listed in Part I of Attachment A, of the existence of the Order until further order of the Court. See 18 U.S.C. § 2705(b). This Court has authority under 18 U.S.C. § 2705(b) to issue "an order commanding a provider of electronic communications service or remote computing service to whom a warrant, subpoena, or court order is directed, for such period as the court deems appropriate, not to notify any other person of the existence of the warrant, subpoena, or court order." Id. In this case, such an order would be appropriate because the requested Order relates to an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation, and its disclosure may alert the targets to the ongoing investigation. Accordingly, there is reason to believe that notification of the existence of the requested Order will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates. See 18 U.S.C. § 2705(b)(2), (3), (5). Some of the evidence in this investigation is stored electronically. If alerted to the investigation, the subjects under investigation could destroy that evidence, including information saved to their personal computers.

20. The United States further requests that the Court order that this application and any resulting Order be sealed

until further Order of the Court. As explained above, these documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

                                        Respectfully submitted,

                                        DAVID J. HICKTON
                                      UNITED STATES ATTORNEY

                                      /s/ Conor Lamb
                                      Conor Lamb
                                      Assistant U.S. Attorney
                                      PA Bar No. 304874